

# NUMBER 13-25-00153-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF L.R., A CHILD

## ON APPEAL FROM THE COUNTY COURT AT LAW NO. 5 OF NUECES COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices West and Fonseca
Memorandum Opinion by Chief Justice Tijerina**

Appellant B.F. (Mother) appeals the trial court's termination of her parental rights to her minor child, L.R.[1] By one issue, Mother contends that the evidence was legally and factually insufficient to support a finding that terminating Mother's parental rights was in L.R.'s best interest. We affirm.

---

[1] We refer to the parties and the child by aliases in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

## I.  BACKGROUND

Brianna Rodriguez, an investigator with appellee the Texas Department of Family and Protective Services (the Department) testified that the Department "received a report alleging neglectful supervision," and "[t]here were concerns for the newborn child and concerns of drug use." Rodriguez met Mother at the hospital where L.R. was born and informed Mother "of the report that [the Department] had received" concerning L.R. Although she initially denied drug use, Mother eventually "did admit to drug usage" of methamphetamine and marijuana one "month prior to her delivery." Rodriguez asked Mother to participate in services, but Mother "did not want to complete any drug screens or hair follicle tests."

Mother informed Rodriguez that "she was living with some friends"; however, those friends told Rodriguez that Mother "had not been living with them for months." Rodriguez stated that the family members that Mother designated were not willing to help. Specifically, Rodriguez spoke to L.R.'s maternal grandmother, "some of [Mother's] older children," a father of one of Mother's other children, and an "alleged paternal uncle and his wife." Rodriguez attempted to contact the man Mother claimed was L.R.'s father, J.B., but she was only able to speak to J.B.'s mother. Rodriguez stated, "[J.B.] never got back with me."[2] According to Rodriguez, she was unable to determine "where [L.R.] would have been residing," and the Department attempted "to screen" people Mother claimed to be living with "to see if they would have been appropriate, to see if the child could go there." However, the people "did not pass [the Department's] background checks."

---

[2] J.B. complied with genetic testing, and it was determined that J.B. is not L.R.'s father.

On cross-examination, Rodriguez agreed that L.R. spent several weeks in the hospital after his birth due to flu and respiratory issues. Rodriguez acknowledged that Mother had shown affection for L.R. and was interested in his health. According to Rodriguez, the Department could have recommended that L.R. not be removed from Mother's custody but instead recommended removal because "[t]hat has been done in the past [with her other children] and it did not work," and "[t]here was a risk and there was potential danger." Rodriguez explained that after the case was "staffed," the Department determined that it was not in L.R.'s best interest to allow L.R. to remain in Mother's custody. Removal of L.R. occurred after an adversarial hearing.

Delia Olivo, a Department caseworker, testified that initially reunification with the parent is the goal. Olivo explained that the Department directs parents to services to help the parent "figure out some of the new changes that need to occur to making their lives with their child [better]." According to Olivo, the initial goal for L.R., a one-year-old child at the time of the trial, was reunification with Mother, and "[t]he goal now is termination of parental rights." When asked how the goal changed, Olivo replied that "halfway" through the case, usually about six months, the Department evaluates whether the parent is "showing that they've mitigated the reasons for removal, are they participating in services, how are they doing with visits." According to Olivo, Mother had a history with the Department and other children, and this was not Mother's "first time in the conservatorship phase." Mother had eleven "intakes that have come into the Department" at the time of the trial, six of which had been "ruled out," meaning the Department had no concerns,

3

and four of the intakes were "reason to believe."[3]

Olivo testified that Mother was asked to complete individual counseling, mental health counseling, parenting classes, drug and alcohol assessment and the recommended treatments, random drug testing, a psychological evaluation, drug court evaluation, and visitation with L.R. Olivo stated that although Mother completed the majority of the required services, she did not complete the random drug testing, which included urine, hair follicle, and alcohol testing. Olivo testified that Mother informed her that "she was not going to drug test anymore. She was tired of this, and she was just not going to do it." Olivo encouraged Mother to get the drug testing, "and she was adamant that she was not going to do it." Mother failed to appear for thirteen of twenty-one scheduled drug tests.

Olivo stated that Mother's noncompliance with court-ordered drug testing concerned her. Olivo explained that Mother "has a history of drug usage," and before the Department could allow L.R. to return to Mother's custody, the Department had to ensure "that there is no drug usage and that [L.R.] would be safe in her care." According to Olivo, Mother's visitation with L.R. was paused because Mother did not comply with drug testing, and, per a court order, Mother's visitation would have been reinstated had she done so. Olivo testified that had Mother complied with drug testing as required, some of the Department's concerns would have been alleviated.

Olivo stated that Mother reported for a drug test in September 2024; however, according to Olivo, the test was not considered and the circumstances caused Olivo to

---

[3] Olivo did not explain what the Department's concerns entailed.

4

have concerns as to the other drug tests Mother submitted. Olivo was not allowed to explain why the test was not considered or the circumstances that led to her concerns about Mother's other tests. Olivo also became concerned because in September 2024, Mother shaved her head, and Mother was required to submit for hair follicle testing, "and her hair was so shaved that [they] couldn't get anything." Olivo testified that three of Mother's other children had been removed from her custody due to concerns about Mother's "drug usage."

Mother had a job and worked two days a week. Olivo testified that Mother had transportation barriers and "through the life of this case, she did not have . . . a stable home. So, she just kind of jumped from place to place." However, Olivo commented that despite these barriers, Mother "was still attending her services." Mother told Olivo "that she didn't have a home so she goes to different homes and stays there." Olivo said, "[U]sually, we go to the homes and check the homes out, make sure that the homes are safe and there's not any danger in the home." Olivo stated that if L.R. were returned to Mother's custody she "wouldn't know where [Mother] would live with [him]."

Olivo relayed that Mother "loves" L.R., "and she was really good with the visitation." Olivo said, "She played with him. She talked to him. She rocked him to sleep. So, visits were good." Eventually, Mother was allowed unsupervised visits with L.R. Mother had one unsupervised visit "at her home [on August 6, 2024]." According to Olivo an issue occurred because when L.R.'s caregiver took him to Mother's home "there was an altercation . . . not with [Mother], but [between] the owner of the home, [Mother's] ex-boyfriend and his mother, in front of [L.R.] and the caregiver got scared along with her daughter." Olivo said Mother "[a]lso . . . did a Facebook posting stating that she wanted

5

to kill herself," which the Department "brought it to the Court's attention," which "suspend[ed] the unsupervised visits and [gave] her visits three times a week supervised."

In May 2024, L.R. was moved from his first foster home and placed "in a substitute home" after Mother provided information about the family to the Department. The new foster parents offered to adopt L.R. According to Olivo, L.R. is "doing very well" and "looks very healthy." Olivo stated that his foster parents "want [L.R.] to be there. They do what they need to do to take good care of him." Olivo noted that because he was born premature, L.R. is "behind on his milestones. So, he's . . . a little bit behind or delayed," and he has an inhaler. Olivo said that L.R. "rolls over, he responds. You know, he can laugh and giggle, but as far as crawling and walking, we're not there" because "his legs were not strong enough."

Olivo stated that the Department "would like to make sure that Mother is sober" and "that she has a home, a safe home for her child." Regarding what she believed would be in L.R.'s best interest, Olivo said, "To have a safe environment where the child is safe and he would be protected."

S.B., L.R.'s twenty-four-year-old sister, testified that she is Mother's oldest child, and she has six siblings, M.M., R.F., M.R., E.F., K.R., and L.R. S.B. stated that: M.M. "grew up" with Mother "here and there"; R.F. left Mother's custody in 2014 at the age of fifteen to live with her father; M.R. did not stay with Mother either and now lives with her grandmother; E.F. lives with his father; and S.B. has custody of K.R. Mother's parental rights to K.R. were not terminated; however, S.B. had been appointed K.R.'s permanent managing conservator when S.B. was a baby.

S.B. was "removed" from Mother's custody in 2015 when she was fifteen years old. S.B. explained that Mother had been a "good mom," but after she was divorced, "[e]verything just started falling apart." The Department asked, "Today, if the Court were to release [L.R.] to [Mother], would you have any concerns?" S.B. replied, "Yes. Plenty." S.B. explained, "No home. Her health. Her mental state. Things that she does. I . . . can't say I trust her with [K.R.]." S.B. reiterated that she had concerns about Mother's "mental health" and "[s]moking." S.B. testified that Mother "bounces from house to house," and she has "dropped her off two different places." Regarding her contact with Mother, S.B. said that she has "tried, but at this point, I'm done." S.B. testified that Mother's family has "tried" to help and support her, but "she didn't want it."

S.B. testified that she had allowed Mother to have visitation with K.R., who was in "pre-K" at the time of the trial. S.B. said, "I tried for four years. I did it, took it away, did it, took it away." The Department asked why S.B. stopped allowing discretionary visitation. S.B. responded:

> Her attitude, demeanor. The way she would tell [K.R.] I'm not her real mom, and that was a problem to me. I sat here and raised that little girl since she was a baby. I provided everything for her. You know, to me, that's not okay. I . . . was 19. Working, going to school. I stepped up and took that baby and I didn't have to.

S.B. clarified that Mother still had supervised visitation with K.R., and she merely ended the discretionary visitations.

When asked why she had appeared to testify, S.B. said, "I want the best for [L.R.], and I don't think it's with her." When asked how she felt about L.R.'s current caregivers, S.B. stated, "Amazing. They're . . . fine. I've grown up [knowing] their family . . . before me and my sister getting removed [from Mother]." S.B. had no concerns about L.R. being

7

in the current caregivers' custody indefinitely. S.B. believed that L.R. would be "safe" with the current caregivers and wanted them to continue having custody of L.R.

Chester Jones, Mother's therapist, testified that he provided individual counseling to Mother, which began in September 2024. Jones stated that Mother suffered from "post-traumatic stress disorder with concurrent disorder of substance abuse," and she has anger issues. Mother's last session with Jones was on January 7, 2025. Jones believed that he and Mother had a "great rapport" and stated, "She was engaged. Just the only difficulty was the instability and the lack of accountability for some of the choices she was making." Jones clarified that Mother had instability in "[h]ousing." The Department asked, "To this day, do you know what [Mother's] housing situation is like?" Jones replied, "No." Jones agreed that it is "important" for someone "who has a substance abuse disorder . . . to continue drug testing" and that it "[w]ould be concerning . . . if that person did not continue drug testing."

Jones believed that Mother had been compliant and that with assistance, she could "conquer these very strong feelings that she has." Jones said, "But when I met with her on the 7th, she was compliant. She was engaged. She was willing to listen to the interventions that was provided as far as the coping skills so she did well there." Jones testified that Mother "made some progress" but needed "a longer duration of counseling." According to Jones, with proper therapy, Mother had the potential of "becoming a good parent for" L.R. Jones did not believe termination was in L.R.'s best interest.

Jones testified that he met with Mother in September 2024 one time, October 2024 three times, did not meet with Mother in November and December 2024, and met once with Mother in January 2025. Jones acknowledged that he did not believe that Mother

8

had shown accountability. He explained:

> So, based on our sessions, [Mother] did explain that she has multiple kids that she doesn't have guardianship over. So, the most recent child, the baby, she's blaming the State for taking away her children and . . . she's not seeing . . . her own choices and her own behavior of why is that so. And she . . . did allow me to educate her on how the system works. I did explain to her that the State is not here to take away your children. She's having a hard time dealing with that. So, that's what I mean about accountability.

The Department asked, "If the Court today were to release [L.R.] to [Mother's] care, do you think that she has the ability to care for herself and for [L.R.] at this time?" Jones replied, "No." Jones clarified as followed:

> When I met with [Mother] on the 7th, she was staying at her mother's mobile home and . . . it wasn't a place of stability. She wasn't really sure she was even going to stay there long enough. Also, from a financial standpoint. She is working some hours here and there, but as far as her income standpoint, just being in a position to be able to provide for the child financially, as well, is a concern also. Once again, dealing with the accountability. Not being accountable. Still working on some anger. There's some concerns there, as well, mentally.

According to Mother, for approximately one or two months prior to the trial, she had "stay[ed] between [a] house [owned by T.A., a woman she calls her adoptive mother,] and a [house owned by a] friend . . . named Jared." Mother clarified she alternates between the two homes "[a]bout every other week. It's like a week on, week off, like I'm staying with my parents basically. But I stay a week with my mom and then a week at Jared's." Mother stated that she also stayed with her "biological mother and [S.B.] when [she] would visit [K.R.] off and on." Mother testified that prior to the current arrangement, she has "always stayed back and forth with Jared." She said that she "helps him with some of his household necessities and stuff like that."

9

Mother does not permanently stay with Jared "[p]artly because" she does not "want to invade in his space." Mother said, "I'm not going to live under anybody's roof where I either feel disrespected or I feel like I have to put out . . . not that I have to put out with Jared in any kind of way, but he has female friends that come over that will just be a big disturbed [sic] problem for myself if I was to stay there constantly." Regarding Jared's female friends, Mother stated that she has her own bedroom in the house, and she was not concerned about his personal life.

Mother explained the reason she does not live permanently with T.A. as follows:

Mental health between herself and myself, but it's more on myself. Triggers that I have of a memory or I, like, get a certain feeling because of her tone or how she acts. Not saying that that's how it is, but my assumption or my judgment of before I even talk to her or ask, I just take off.

Later Mother testified that if L.R. were returned to her, she would stay with T.A. despite the mental health issues, stating: "[T.A.] has the same struggle that I do as we're working together to fix those areas." Mother was aware that T.A. had a criminal history but was not aware of "exactly the charge." Mother was aware that T.A. had a past problem with drug usage, which according to Mother, T.A. overcame.

Mother began working at a local convention center approximately two months or "a little longer" before the trial. Mother agreed that she has had "stability issues" and that she was "still working on that today." Mother testified that although she had been "accepted into housing," she could not "come up with the deposit at that time and the Department" could not help her "secure the apartment." Mother explained that she could not find a place to live "on her own" with her salary.

10

Mother has been put on a waiting list for an apartment in Flour Bluff, Texas. Mother clarified however that she planned to continue moving back and forth from T.A.'s house to Jared's house if L.R. were returned to her. Mother explained that it is her responsibility to take care of L.R., and she would not place that responsibility on T.A. or Jared.

Mother denied telling Rodriguez that she used methamphetamine while pregnant and claimed that she told Rodriguez that she only used marijuana "a month prior to" L.R.'s birth. The Department asked, "You didn't tell her that you used methamphetamines?" Mother replied, "Amphetamines was a past usage. That if there was usage of the methamphetamines, I was not sure about it, but all I did was smoke a joint prior to the month of me having [L.R.]."

Mother acknowledged that she had "previous Child Protective Services cases" and that "[s]ome of [those cases] resulted in removals in which the children were no longer in [her] care, although [her] rights weren't terminated." Mother agreed that in one of the cases, drug use had been an issue and said, "The other cases, no. It's more defiance." Mother explained, "Just I'm not going to do their safety or service plans. They don't like it when [I] tell them no." Mother said she stopped drug testing because she had not wanted "to do services." Mother understood that the services were court-ordered and that "one of the grounds for termination of [her] parental rights" is her failure to complete the services. Mother decided to stop the drug testing despite knowing that her parental rights would be terminated.

According to Mother, she did not complete the urinalysis test on September 13, 2024, because she "could not pee." Mother explained that she went to take the test and was waiting, and "the ladies were weird that day, and [she] felt like all eyes . . . it was just

11

not comfortable." Mother said, "So, no, I could not pee that day. I told them I can come back later on this afternoon. They said, no, once you leave, that's it." That was the last time Mother went to take a drug test.

Mother testified that she would like L.R. returned to her. Mother stated, "I have not had a chance to be a mom to him. I've been robbed of that . . . [b]ecause they had no grounds to actually have this case open."

Mother stated that when she was given unsupervised visitation with L.R. in August 2024, she posted a message on Facebook because she was "down that day." Mother said, "I wouldn't say my mental health . . . it was a diary, in a sense. If I was to have a diary, that would probably have been what it said." The trial court admitted a copy of the Facebook message, which states, in relevant part,

> I wish my life would just end already in [sic] sick and tiered [sic] of doing doing doing and trying to never let situations and challenges change why and how [I] am but I'm literally just don't want to exist anymore[.] I'm tiered [sic] of trying to life life and my my [sic] own Choices.

The Department asked, "Well, in regards to this one post, you mentioned self harm, right?" Mother replied, "No, I did not mention self harm. I just said I wish my life was . . . like, poor choices of words, but I don't remember putting in there that I wish I was dead or that I wish I was harming myself. I just wish that it would end." The Department asked whether Mother believed that her Facebook "post had anything to do with" the termination of her unsupervised visits with L.R. Mother said, "I mean, they say that it did and I can understand why, but it's about a power control with them a lot of times."

Mother agreed that she had not raised her other children until their eighteenth birthday. Mother explained that S.B. and her other siblings had been "removed." The

Department asked, "What about the other five children?" Mother replied,

> No, my mom handed my second one over when she was an adult. I didn't have a choice in that one because by the time my mom handed her over to her dad, I didn't get to go pick her up or get her back because the dad knew his rights and exercised them. So, I did not get to see that child again until she was five. After that one, [R.F.], well, they were taken by the Department. Her and [S.B.]. They stayed with my ex-husband, which, at the time, was just a boyfriend for approximately two to three years. In that third year, I exercised my rights and I came up with money and I hired a lawyer and I got them back.

The Department asked, "Do you visit your other children?" Mother said,

> Yes, I do. [M.M. is] the only one I have not visited. [R.F.] does not want to talk to me and I'm not going to push the issue because, I'm sorry, I'm going to try to be a respectful mom and honor her wishes. When she's ready, she'll find a way to reach out to me. That's all I can say. As much as it hurts. She'll reach out to me when she's ready.
>
> And as far as my son, I visit him and talk to him almost every other day, every couple weeks. It all depends on what he has going on at school and what he's doing because, again, I'm not a pushover mom. I'm not going to tell them you have to contact me. You have to do this, you have to do that. It gets you nowhere.

M.D., L.R.'s foster mother, testified that L.R. had been in her home since May 2024, and that he is "doing absolutely amazing." M.D. stated that she loves L.R. and would adopt him if Mother's parental rights are terminated. M.D. lives with her husband, her four-year-old daughter, and L.R. Because M.D. works, L.R. "goes to daycare Monday through Friday [from 7:30 until 5:00] and then on the weekends, [M.D.'s] husband takes care of him." M.D. testified that she has "bonded with him."

L.R. had respiratory issues when he was first placed in M.D.'s home, and "he has asthma." According to M.D., those issues have been alleviated. L.R. is healthy; however, he is unable to stand up fully by himself as he has "delays" due to his premature birth. L.R. appears to be happy.

13

M.D. has known Mother for seven years. M.D. would allow Mother visitation with L.R. if "she were to be clean" because M.D. is concerned about Mother's drug usage. M.D. preferred that any visitation take place "in a public setting." M.D. agreed that she is willing to help L.R. maintain a relationship with his siblings. M.D. believes that it is in L.R.'s best interest that Mother's parental rights are terminated.

Jennifer Del Bosque, an examiner and drug tester with Precision DNA, testified that she monitored Mother take a drug test on September 13, 2024, when another employee asked her to assist with Mother's drug screening. Del Bosque explained that because Mother's tests were supposed to be observed, "[t]he door has to be open" and she had to "look" at Mother "while [she was] using the restroom."

Another employee gave Mother an open cup to collect her urine, Mother took the cup, Del Bosque observed Mother sit on the toilet, "she placed both hands underneath herself and, at that moment, when she placed her hands underneath, [Del Bosque] hear[d], like a popping sound," and the cup fell. Del Bosque did not see or hear Mother urinate. Del Bosque said, "So, when the cup fell, [Mother] kind of, like freaked out and . . . she cussed and she was just like I can't wait, I can't wait, I can't wait." Del Bosque told Mother, "[W]ell, if you leave, we're going to have to put you as a refusal."

Del Bosque testified that Mother left so fast that she was not able to provide "a copy of the paper that said that . . . it was a refusal because she just took off straight out the door." Del Bosque also observed the cup with some urine in the toilet. She collected the cup, and "there wasn't a temperature reading." Del Bosque explained that the cup has "a strip on there [that have] little bubbles . . . [that will] tell you the temperature . . . when somebody urinates in the cup, it'll give you that reading." Del Bosque said, "If . . . the

14

bubbles aren't within that reading, then that means that the urine that was brought in was already cold or it was super hot." Del Bosque clarified that even when a cup falls into the toilet, the temperature "is not going to change."

After collecting the cup, Del Bosque flushed the toilet, and she "observed that there was . . . some kind of plastic inside the toilet, but at that moment, [she] was already flushing the toilet . . . but [she] couldn't grab it." Del Bosque reported the incident to the Department, and she found the incident abnormal and insinuated that Mother was trying to provide a fake sample of urine. Del Bosque opined, "So, as far as, you know, why is somebody in a rush like that, in my past experience, it's always been because they bring in something that they're not supposed to have whenever it comes to drug testing."

On March 7, 2025, the trial court terminated Mother's parental rights on the basis that Mother violated § 161.001(b)(1)(E), (O), and (P) of the Texas Family Code and that termination was in L.R.'s best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E), (O), and (P), § 161.001(b)(2). This appeal followed.

## II.    STANDARD OF REVIEW

Involuntary termination of parental rights involves fundamental constitutional rights and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.—Corpus Christi–Edinburg 2006, no pet.). Therefore, termination of the parent-child relationship must be supported by clear and convincing evidence. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d at 778. Before terminating the parent-child relationship, the trial court must find by clear and convincing evidence that the parent

15

committed one of the acts or omissions prohibited by § 161.001(b)(1) of the Texas Family Code. TEX. FAM. CODE ANN. § 161.001(b)(1); *In re J.L.*, 163 S.W.3d at 84. The trial court must also find by clear and convincing evidence that termination of parental rights is in the children's best interest. TEX. FAM. CODE ANN. § 161.001(b)(2); *see id.* § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child.").

The "clear and convincing" standard falls between the preponderance of the evidence standard and the reasonable doubt standard. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *Porter v. Tex. Dep't of Protective & Regul. Servs.*, 105 S.W.3d 52, 57 (Tex. App.—Corpus Christi–Edinburg 2003, no pet.). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

In reviewing the legal sufficiency of the evidence supporting parental termination, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *In re D.S.P.*, 210 S.W.3d at 778. We must assume that the trier of fact resolved disputed facts in favor of its finding if it was reasonable to do so. *In re J.L.*, 163 S.W.3d at 85 (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under a factual sufficiency standard, we consider whether the

> disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have

credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient.

*In re J.F.C.*, 96 S.W.3d at 266.

### III. APPLICABLE LAW

In *Holley v. Adams*, the Texas Supreme Court provided the following nonexclusive list of factors for the trier of fact in a termination case to use in determining the best interest of the child: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976).

### IV. DISCUSSION

There is evidence that during the pendency of the case, Mother did not tend to her own mental health needs and was unable to visit with L.R. while he was not in her custody because she refused to take the required drug tests. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (providing that the trial court may consider the parent's inability to provide adequate care, lack of parenting skills, and poor judgment in best-interest analysis). Mother admitted that she used methamphetamines and marijuana while knowing that she was pregnant with L.R. "A mother's use of illegal drugs during pregnancy endangers the physical wellbeing of her unborn child." *In re E.D.*, 682 S.W.3d

17

595, 608 (Tex. App.—Houston [1st Dist.] 2023, pet. denied); *In re C.A.J.*, 122 S.W.3d at 893 (explaining that a mother's drug use during pregnancy is a factor to consider in a best-interest analysis); *see In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) ("Mother's use of controlled substances while pregnant created a dangerous environment for J.W."); *see also In re K.N.*, No. 02-13-00062-CV, 2013 WL 3325104, at *6 (Tex. App.—Fort Worth June 27, 2013, no pet.) (mem. op.) (considering mother's drug use during pregnancy in best-interest determination). Furthermore, "[a] continuing pattern of illegal drug use . . . implicates most of the *Holley* factors and will support a finding that termination of parental rights is in a child's best interest." *In re E.D.*, 682 S.W.3d at 607. Here, the evidence supports a finding that Mother has exhibited a continuing pattern of drug use in this case and in the past, which resulted in her losing custody to some of her children. *See id.*; *see also* TEX. FAM. CODE ANN. § 263.307(b)(8) (providing that the fact finder may consider a parent's history of substance abuse in best-interest determination); *In re A.M.O.*, No. 04-17-00798-CV, 2018 WL 2222207, at *2 (Tex. App.—San Antonio, May 16, 2018, no pet.) (mem. op.) ("A parent's illegal drug use supports a finding that termination of the parent-child relationship is in the best interest of the child.").

Moreover, "a fact finder reasonably can infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs." *In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Therefore, the fact finder was free to infer that Mother continued to use illegal drugs during the pendency of the case. *See id.* Evidence that Mother used illegal drugs, failed to comply with drug testing, and refused a urine drug test knowing that she would not be allowed to visit L.R. supports a finding that returning L.R. to Mother is not in L.R.'s

best interest. *See Holley*, 544 S.W.2d at 371–72; *see also* TEX. FAM. CODE ANN. § 263.307(b)(8); *In re A.M.O.*, 2018 WL 2222207, at *2; *In re K.N.*, No. 02-13-00062-CV, 2013 WL 3325104, at *6 (Tex. App.—Fort Worth June 27, 2013, no pet.) (mem. op.) (considering mother's drug use during pregnancy in best-interest determination). This is because "drug use can destabilize the home and expose children to physical and emotional harm if not resolved." *In re A.L.S.*, 660 S.W.3d 257, 275–76 (Tex. App.—San Antonio 2022, pet. denied). Fact finders may give "great weight" to evidence of Mother's drug-related conduct. *See In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (internal quotation marks omitted); *see also In re K.N.*, 2013 WL 3325104, at *6; *In re A.M.O.*, 2018 WL 2222207, at *2.

Additionally, "[a] fact finder may infer from a parent's failure to take the initiative to complete the services required to regain possession of his child that he does not have the ability to motivate himself to seek out available resources needed now or in the future." *In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). Here, Mother admitted that although she knew she would not have visitation with L.R. and potentially lose her parental rights by not submitting to drug testing, she refused to do so and in fact shaved her head, which prevented hair follicle testing from being done. *See id.* There is also evidence that Mother attempted to provide a false urine sample for drug testing. *See id.* These acts support a reasonable inference that returning L.R. to Mother is not in his best interest. *See Holley*, 544 S.W.2d at 371–72; *see also* TEX. FAM. CODE ANN. § 263.307(b)(8); *In re A.M.O.*, 2018 WL 2222207, at *2.

Mother testified that she refused to take the required drug tests although she knew that she would not be allowed to visit L.R. because she was tired and frustrated with the

19

Department's requests. However, the evidence showed that Mother stopped complying with the drug tests after she apparently attempted to alter the results of the urine test. The fact finder could have disbelieved Mother's testimony and reasonably found that she stopped complying with the tests because she would not pass them. *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("A factfinder reasonably could infer that Aja's failure to submit to the court-ordered drug screening indicated she was avoiding testing because she was using drugs."); *In re O.L.W.*, No. 04-24-00208-CV, 2024 WL 3588395, at *4 (Tex. App.—San Antonio July 31, 2024, pet. denied) (mem. op.) ("Like illegal drug use, failure to submit to drug testing—through which the trial court could infer illegal drug abuse—is relevant to multiple best-interest considerations."). Thus, the fact finder could have reasonably concluded that Mother's non-compliance with the Department and failure to visit with L.R. showed a lack of interest in retaining her parental rights. *See In re J.M.T.*, 519 S.W.3d at 270; *see also In re C.J.P.*, No. 04-24-00458-CV, 2024 WL 5195302, at *12 (Tex. App.—San Antonio Dec. 23, 2024, no pet.) (mem. op.). This evidence supports the best interest finding. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (providing that the same evidence of acts or omissions used to establish grounds for termination under § 161.001(b)(1) may be probative in determining the best interests of the child); *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 619 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (noting that the parent lacked parental abilities and showed no interest in caring for the children, which supported a finding that termination was in the children's best interest); *In re C.E.K.*, 214 S.W.3d 492, 498 (Tex. App.—Dallas 2006, no pet.) (setting out that parents need to maintain stability for the children); *see also In re S.R.*, 452 S.W.3d 351, 362 (Tex. App.—Houston [14th Dist.]

2014, pet. denied) ("Failure to maintain stability endangers the child's physical and emotional well-being.").

It is a compelling state interest to establish a stable and permanent home for L.R., and the Department has shown that Mother has been unable to do so. *See In re S.R.*, 452 S.W.3d at 367 ("Lack of stability, including a stable home, supports a finding that the parent is unable to provide for a child's emotional and physical needs."). Whether L.R. has achieved permanency with his foster family is an important factor to consider in a best interest analysis. *See In re J.W.*, 645 S.W.3d at 747 ("Importantly, given the child-centered focus of the best-interest inquiry, we may not discount or minimize the level of permanence J.W. has achieved with his foster family, with whom he has lived since he was a month old."). The foster parents intend to adopt L.R., and several of the witnesses testified that it would be in L.R.'s best interest to terminate Mother's parental rights. *See In re D.M.*, 452 S.W.3d 462, 470 (Tex. App.—San Antonio 2014, no pet.) ("[W]e . . . presume that prompt and permanent placement of the child in a safe environment is in the child's best interest."). Moreover, Mother has not established a stable home environment for L.R. as she has moved several times during the pendency of the case from one home to another. *See In re C.E.K.*, 214 S.W.3d at 498; *Doyle v. Tex. Dep't of Protective & Regul. Servs.*, 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet. denied) (concluding that termination is in the child's best interest when there is evidence that the parent failed to provide a stable home and provide for a child's needs); *see also In re S.R.*, 452 S.W.3d at 362.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that

21

that termination of Mother's parental rights is in L.R.'s best interest. *See In re J.L.*, 163 S.W.3d at 85; *In re D.S.P.*, 210 S.W.3d at 778. Moreover, in light of all of the evidence, the fact finder could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in L.R.'s best interest. *See In re J.F.C.*, 96 S.W.3d at 266. Accordingly, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that termination is in L.R.'s best interest. We overrule Mother's sole issue.

## V. CONCLUSION

We affirm the trial court's judgment.

JAIME TIJERINA
Chief Justice

Delivered and filed on the
7th day of August, 2025.

22